**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

———————————————————————

DEVIN JEFFERSON,              :

                Plaintiff,    :      Civ. No. 15-1086 (KM) (MAH)

                           :

      v.                     :       **OPINION**

                           :

OFFICER GEORGE LIAS; CITY OF    :
ELIZABETH,

              Defendants.    :

———————————————————————  :

**KEVIN MCNULTY, U.S.D.J.**

## I.      INTRODUCTION

On January 15, 2014, plaintiff Devin Jefferson led Elizabeth Police Department ("EPD") officers in a car chase that ended with defendant Officer George Lias shooting Jefferson in the arm. Jefferson thereafter brought this suit against Lias and the City of Elizabeth (the "City") asserting a Fourth Amendment excessive force claim and a *Monell*[1] claim pursuant to 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J.S.A. § 10:6-2 ("NJCRA"). DE 47 (third amended complaint). Following the close of discovery, Lias moved for summary judgment and the City moved for summary judgment and to bar Jefferson's liability expert. DE 77 & 78 (motions). I granted defendants' motions for summary judgment after finding that Lias was entitled to qualified immunity; that Jefferson suffered no constitutional injury; and that the *Monell* claim against the City therefore failed because there was no underlying constitutional violation. DE 86 (opinion), 87 (order). The United States Court of Appeals for the Third Circuit

---

[1] In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), the Supreme Court held that a municipal government may be liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" alleged by the plaintiff.

vacated the grant of summary judgment in favor of Lias, finding that he was not entitled to qualified immunity for a claim of unreasonable use of force. *Jefferson v. Lias*, 21 F.4th 74 (3d Cir. 2021). Because the claim against Lias was revived, it becomes necessary to analyze the *Monell* claim against the City. *Id.* at 87. At the Court's invitation, the City and Jefferson then filed supplemental briefing (DE 97, 98, 99). The City's motion for summary judgment and to bar the testimony of Jefferson's expert (DE 78) is now ripe for decision. For the reasons stated below, the City's motion is denied.

## II.    BACKGROUND

### 1. Facts

The facts pertaining to the January 15, 2014, incident and Jefferson's *Monell* claim are set forth below. I view the facts relevant to Jefferson's *Monell* Claim against the City in the light most favorable to Jefferson.

#### a.  The Car Chase and Shooting

The Third Circuit summarized the facts of the January 15, 2014, incident as follows:

The events in question took place . . . as Jefferson was driving home from a concert venue in Elizabeth, New Jersey. Officer Timothy Staffer of the Elizabeth Police Department, on patrol in his cruiser that night, took notice of Jefferson traveling at a high speed with his car alarm blaring. Jefferson, playing music loudly in his car, was apparently oblivious to the alarm. Officer Staffer, suspecting the vehicle may have been stolen, turned to follow Jefferson and activated his siren and overhead lights in an attempt to pull over the vehicle. As it so happened, Jefferson was approaching the end of a five-year probation term and was driving with an open container of alcohol in the car. Fearing a probation violation, Jefferson did not pull over for Officer Staffer, and a car chase ensued.

Officer Lias, also on duty that night, eventually joined the pursuit of Jefferson after hearing radio dispatches concerning the activity. At the time Lias joined the pursuit, he was only aware of the information that had been communicated over the radio, namely that Jefferson was driving a possibly stolen vehicle, the vehicle's license plate number, and the direction it was headed. Although other officers during the pursuit "observed Mr. Jefferson traveling at high speeds, running red lights, ignoring police signals to pull over, and driving in close

proximity to other vehicles," Lias did not personally witness Jefferson running red lights or weaving in and out of traffic.

Near the end of the pursuit, Jefferson was traveling northbound on Jefferson Avenue when he made a right turn on Mary Street, hitting a fire hydrant. Officers then surrounded Jefferson's vehicle on both left and right sides. To evade the officers, Jefferson reversed, first striking a police vehicle before backing up onto the intersection of Jefferson Avenue and Mary Street, attempting to turn back onto Jefferson Avenue from the direction he had arrived. Lias arrived at the scene in his vehicle as Jefferson was in the process of completing his maneuver in the intersection. He had not personally witnessed Jefferson striking either the fire hydrant or the police vehicle.

Both parties characterize the following moments, which culminated in Lias shooting Jefferson, in different terms. According to Jefferson, as he finished reversing from Mary Street and began to proceed forward onto Jefferson Avenue, "Lias exited from the front passenger door of his vehicle, maneuvered around the hood of his car toward Plaintiff's vehicle, and settled into a shooting position. Officer Lias discharged his firearm at Plaintiff as Plaintiff's vehicle passed in front of him . . . Prior to shooting, Officer Lias did not see any police officers attempt to escape Plaintiff's vehicle path." In Officer Lias' telling, "[i]n the last split second as Mr. Jefferson was passing Officer Lias's police car, Officer Lias discharged his firearm once at Mr. Jefferson's vehicle because he testified that he feared for his own safety and others around him, including other officers and Officer Banos who he did not know where he was at the time but knew he was in the area." The record contains video footage depicting the shooting obtained from a utility pole.

Jefferson was struck in his left forearm, fracturing the bones there. After he was hit, Jefferson continued to drive away and checked himself into the hospital. Jefferson was eventually indicted in New Jersey State Court for second-degree eluding, and ultimately pled guilty to the charge.

*Jefferson*, 21 F. 4th at 76–77 (citations omitted).

### b. Officer Lias and the Elizabeth Police Department

#### (i)   Officer Lias

Lias entered the police academy in 2010 and, at the time of the events in question (January 2014), had been employed by the EPD for approximately 4 years. DE 82-3 (Lias Deposition Transcript ("Lias Tr.")) at 3. He had been performing police duties since June 2010. *Id.* at 4. The EPD had not formally evaluated Lias's performance as a police officer since "early

in [his] career," and he never had a semi-annual or annual evaluation. *Id.* at 4–5. At his 2018 deposition, Lias testified that he had not seen an evaluation with his name on it since he emerged from probationary status. *Id.* at 5–7.

Between June 2010, the month Lias commenced regular police duties, and January 15, 2014, Lias was the subject of six complaints—known as "Complaints Against Police" or "CAP"—three of which involved alleged excessive force. Ginzburg Decl. dated Oct. 17, 2019, Ex. 3 (Lias CAPs History).[2] The excessive force complaints are summarized as follows:

1. A complainant alleged that in November 2013, he (the complainant) was walking to a liquor store with a friend when two officers in an unmarked car stopped him. The driver of the car—evidently Lias—"pointed a gun at him and told him to leave the area"; as they attempted to do so, the officers arrested them. During the arrest—which the complainant admitted he resisted—Officer Lias allegedly pepper sprayed him and punched him in the head 8 to 10 times. Lias denied pointing a gun at the complainant but admitted using pepper spray and force, stating that he used force in part because he saw that the complainant was wearing a two-finger ring resembling "brass knuckles," and feared for his safety. The investigating officer found the charge was not sustained; that Lias used an "appropriate level of force"; and that there was "no corroboration of [the complainant's] accusation that Lias at any point pulled his weapon." The complainant was found to be in possession of a ring resembling brass knuckles and two small bags of marijuana, but criminal charges were dismissed.

---

[2] CAPs are the subject of a protective order and, therefore, were not filed on the Court's electronic filing system.

2. A complainant alleged that in August 2012, Officer Lias responded to a complaint of loud music in her backyard. As she was unplugging the speaker, Lias punched her in the head, then dragged her onto the ground and handcuffed her. Another officer completed an investigation report stating that the complainant had resisted arrest, and that, as Officer Lias was attempting to arrest her, several men attempted to interfere, at which point Lias "pulled out his service weapon & ordered everyone to stay back." Lias admitted striking the complainant while she was handcuffed, but stated that he only did so because she had "grabbed a hold of my right wrist with her hand and dug her fingernails into my wrist breaking the skin." He also admitted drawing his service weapon "for the safety of my partner and myself" because "several parties ran toward my direction" to help the complainant. The complaint was not sustained after the complainant did not respond to letters asking her to speak with investigators about the incident.

3. A complainant alleged that in August 2010, he was attending a house party when several officers entered "to look for suspects of an assault/robbery." The officers ordered everyone onto the floor. The complainant allegedly "pointed out to the officers that the handcuffs on his cousin" were too tight; in response, officers sprayed the complainant with pepper spray and "began hitting and kicking him as he lay on the floor." Several witnesses—including partygoers and officers—confirmed that Lias used force on the complainant, but disagreed as to the extent and the reasons. The partygoers generally stated that Lias assaulted Medina and it was unclear why; the officers generally stated that Medina acted aggressively and attempted to stand up after being ordered to remain on the floor, at which point Lias used force to subdue

5

him. An investigation concluded there was an altercation between Lias and the complainant, but that Lias's use of force was justified. The investigating officer wrote: "while it is irrefutable that . . . Officer Lias in particular employed a significant degree of force . . . , there is no indication that the force used was excessive or unnecessary."  Thus Lias was "exonerated."

Lias has never been required to attend additional or supplemental training beyond the required semi-annual training. DE 82-3 at 8–9 (Lias Tr.). Further, Lias was not aware "of any fellow police officers that have been disciplined," for any reason, ever. *Id.* at 10.

(ii)     <i>Excessive Force Complaints against EPD Officers</i>

Between 2011 and 2017, EPD officers had 119 excessive force complaints.. DE 82-8 at 2–22 (EPD Professional Standards Summary Report Forms (statistics of complaints made against EPD officers from 2011 to 2017 and reported to the Union County Prosecutor's Office)). Records produced during discovery, and testimony of EPD Deputy Chief Giacomo Sacca, establish that the EPD did not sustain any of these complaints. DE 82-8 at 2–22 (EPD's Professional Standards Summary Report Forms); DE 82-10 (Sacca Deposition Transcript ("Sacca Tr.")) at 5. Sacca testified that from 1995, when he joined the EPD, to 2017, a span of 22 years, he could recall the EPD sustaining only one excessive force complaint. DE 82-10 at 6.

(iii)     <i>EPD Early Warning System and Excessive Force Investigations</i>

Sacca testified that in 2017, the Attorney General "came out with a formalized method for an early warning system[3] that created an officer flagging system and what must be put in

---

[3] Attorney General Law Enforcement Directive No. 2018-3 explains:

An Early Warning System ("EW System") is an important management tool designed to detect patterns and trends in police conduct before that conduct escalates. An effective EW System can assist a law enforcement agency in identifying and remediating problematic officer conduct that poses a potential risk to the public, to the agency, and

it." DE 78-5 (Sacca Tr.) at 33. Sacca also testified that "[p]rior to that, early warnings were mentioned within the guideline that agencies had a responsibility to monitor the performance of their officers . . . ." *Id*. Sacca stated that the EPD's internal affairs unit had a system for monitoring complaints against personnel in 2014. *Id*. When a new complaint came in, there would be a review of the officer's complaint history in the central filing system maintained by the internal affairs unit. *Id*. Sacca stated he could not answer how many excessive force complaints would need to be lodged before internal affairs issued an early warning. *Id*. The internal affairs unit's review of Lias's use of force against Jefferson on January 15, 2014, did not mention his complaint history. Ginzburg Decl. dated Oct. 7, 2019, Ex. 1 (CAPs) at 335–37.  As noted above, at that point Lias had been the subject of six prior complaints, three of which involved excessive force.

Sacca also testified that supervisors, rather than members of the internal affairs unit, could investigate complaints considered to be minor rule infractions, but that excessive force complaints were not considered to be minor rule infractions. DE 78-5 at 25. Thus, according to Sacca, excessive force complaints were investigated by either internal affairs unit investigators or, in the case of serious bodily injury, the Union County Prosecutor's Office. *Id.* at 25–26. However, the record contains several examples of excessive force-related CAPs that were investigated by supervisors, not permanent personnel of the internal affairs unit. *See*, *e.g.*, Ginzburg Decl. dated Oct. 7, 2019, Ex. 1 at 001–010 (CAP 5554), 047–49 (CAP 5614), 064

---

to the officer. EW Systems, therefore, serve to not only increase public safety and public confidence in law enforcement, but also to assist officers through early intervention.

*Id.* (available at https://www.njoag.gov/resources/ag-directives/ (last visited on Sept. 20, 2022). This directive mandating that all law enforcement agencies in New Jersey adopt and implement EW Systems was issued on March 20, 2018. *Id.*

(CAP 5628), 068–70 (CAP 5629), 113–14 (CAP 5757), 145 (CAP 5808), 150 (CAP 5817), 203–

05 (CAP 5894/5895/5896), 210 (CAP 5902), 212 (CAP 5914/5915), 332–33 (CAP 5950).

Although the EPD had 267 excessive force complaints for the ten-year period between

2008 and 2017, the Elizabeth City Council never discussed the EPD's police training methods,

budget, use of force, use of deadly force, or vehicular pursuit guidelines. DE 82-9 at 7, 10 (City's

response no. 39 to Jefferson's requests for production).

### 2.  The Bayer Report

Jefferson retained William J. Bayer as his liability expert on police practices. DE 78-5 at

38. Bayer was employed by the New York City Police Department for thirty-two years,

attaining the ranks of sergeant, lieutenant, captain, and deputy inspector. *Id.* He also served as the

chief of police for Vanderbilt University and the enforcement inspector for the New York City

Department of Parks and Recreation. *Id.* He has undergraduate degrees in business and public

administration, masters' degrees in public administration and criminal justice, and his PhD

dissertation subject area "was the role of the patrol sergeant (supervisor) in police operations."

*Id.* Bayer asserts since 2006, he works in police and law enforcement practices as a private

consultant and expert witness in a variety of areas including investigation of critical incidents;

the internal affairs function; police discipline; use of force and deadly force issues; high-speed

pursuits; investigative procedures and supervision; personnel practices; management,

supervision, and administration; liability management; and police and procedure development.

*Id*.

Bayer's expert report opines that it is "highly suspect" that between 2011 and 2018 there

were more than 250 excessive force complaints made against EPD officers without one being

sustained. DE 78-5 at 39. Bayer sets forth the following CAP examples in his report in support of

his conclusion that the EPD did not adequately investigate excessive force complaints:

CAP 2011-5660: The complainant's charge was not sustained because, among other things, the complainant supposedly did not state to medical personnel that he was assaulted by the police. However, the complainant did make that statement to medical personnel.

CAP 2011-5632: Complainant "mouthed off" to the police and was roughed up. He was arrested for disorderly conduct. Investigation resulted in determination of unfounded.

CAP 2011-5627: Complainant suffered a punctured lung and broken ribs. The charge of excessive force was not sustained.

CAP 2011-5618: Investigator was unable to contact the complainant and therefore the charge was not sustained.

CAP 2011-5614: The police were involved in a bar fight that resulted in an insufficient investigation.

CAP 2011-5617: No investigation conducted.

CAP 2011-5608: No investigation of an allegation of a police officer having alcohol on his breath.

CAP 2011-5628: The investigator believed the officer's version of events without explaining why.

CAP 2011-5655: The investigator believed the officer's version of events without explaining why.

CAP 2013-5947 (Involving Officer Lias): Investigator accepted Officer Lias's word over that of the complainant; Lias claimed that the complainant (Wright) sold marijuana to Gallman as an excuse for a stop. However, no marijuana was recovered from Gallman. Elizabeth Police Department refused to comply with defendants' discovery requests. The case was ultimately dismissed against both complainants.

CAP 2013-5665: The investigator believed the officer's account with no explanation.

CAP 2013-5617: Complainant complained of being hit on his head by the police repeatedly. There was no investigation.

CAP 2013-5902: Complainant was stopped for no reason and slammed onto police vehicle. There was no investigation.

CAP 2013-5914/5915: Criminal charges were dismissed against the complainant in exchange for withdrawing excessive force complaint.

CAP 2013-5921: Charge of assault against a police officer was downgraded to ordinance violation in exchange for dismissal of excessive force complaint.

CAP 2013-5932: No investigation done.

CAP 2013-5950: The officers' word was believed and no further investigation done other than taking statements.

DE 78-5 at 39–40.

Bayer opines that a review of EPD CAPS "suggests a police culture and custom and an institutional toleration allowing, permitting, excusing and encouraging the use of excessive force." DE 78-5 at 41. He notes that "excessive force complaints are investigated by patrol supervisors directly involved with the subordinates under investigation" and "they are then reviewed by a higher ranking officer who can be viewed as a 'rubber stamp' of approval." *Id.* Bayer concludes that "if there are no consequences for using excessive force, it becomes the policy of the agency." *Id.* Bayer points to Lias's six CAPs from 2010 through 2013, and opines:

> In a properly administrated personnel management system, three or four such complaints should have triggered an evaluation of Officer Lias's performance and indicated a need for additional training or counseling. These systems, generally a computerized database of all of an officer's documented actions and activities, sometimes called "early warning systems," would have alerted police management to take a closer examination of Officer Lias's performance and led to the type of training or counseling that should have precluded the shooting of the plaintiff.

DE 78-5 at 41.

Bayer further opines that the EPD's lack of routine formal performance evaluations—"where a supervisor interacts with the officer to discuss performance, make recommendations, and follow up"—prior to 2015 "is in marked contrast to virtually every single other police department that [Bayer is] aware of, which conduct routine performance evaluations." DE 78-5 at 41.

10

Bayer also opines that it is "highly unusual" for complaints to be investigated by the officers' supervisors and not specifically trained internal affairs investigators. DE 78-5 at 41–42. He explains:

> In my experience and knowledge of policing, the purpose of an internal affairs unit within a police department is to perform investigations of complaints against police personnel. Having direct supervisors perform investigations of complaints against personnel results in a bias against complainants because their supervisors, as human beings and colleagues, would much prefer to avoid censuring their subordinates by sustaining allegations of excessive force. Among other things, substantiating such allegations may negatively impact a police officer's career prospects, possibility of promotion, pay raises, etc. Supervisors are inherently adverse to putting their colleagues' livelihood in danger on account of complaints oftentimes made by criminal offenders. For these reasons, internal affairs units are typically staffed by officers detached from the officers they are assigned to investigate.

DE 78-5 at 41–42.

## III.   DISCUSSION

### A.  The City's Motion to Bar Jefferson's Expert

The City moves to bar Bayer's testimony on the basis that: (1) his opinions are "net opinions"[4] and his report consists of bare, unsupported conclusions; (2) his judgments, conclusions, and opinions are not the product of reliable principles or methods; and (3) he "reaches his opinions by simply accepting the version of facts as presented by Plaintiff, while totally discounting the version as presented by Defendants." DE 78-3 at 17–18, 85 at 9.

Jefferson responds as follows:

_____

[4] "Under New Jersey law, an expert's bare conclusions, unsupported by factual evidence are an inadmissible net opinion." *W. Am. Ins. Co. v. Jersey Cent. Power & Light Co.*, No. 03-6161, 2008 WL 5244232, at *5 (D.N.J. Dec. 15, 2008) (quotations omitted). The admissibility of expert testimony in federal court, however, "is not governed by the New Jersey net opinion rule, but by the Federal Rules of Evidence." *Gurvey v. Twp. of Montclair N.J.*, No. 19-17525, 2022 WL 970303, at *19 (D.N.J. Mar. 31, 2022). Nevertheless, it is not uncommon for New Jersey federal courts and federal practitioners to use the shorthand terminology "net opinion," even when applying federal standards.

(1) Bayer's opinion is based on the records in this action, including the pleadings, the depositions of Jefferson and Sacca, the City's responses to interrogatories, hundreds of pages of CAP investigation reports, State of New Jersey Internal Affairs Policies and Procedures, internal affairs statistics compiled by the Union County Prosecutor's Office, and case law concerning *Monell*-based liability, DE 82 at 34 (citing DE 75 at 39, 43–44 (Bayer Report);

(2) Bayer relied on his nearly forty years of law enforcement service and his review of the aforementioned materials in concluding that (a) it is highly unusual that the EPD did not sustain one of more than 250 excessive force claims, (b) the EPD does not formally evaluate its officers on a regular basis, (c) the EPD's internal affairs unit's investigations were inadequate, (d) internal affairs investigators implemented various methods to avoid sustaining excessive force complaints, (e) the EPD failed to implement an effective early warning system, and (f) a large percentage of excessive force claims were investigated by supervisors and not trained internal affairs personnel; and

(3) Bayer specifically drafted his report to avoid opining on the ultimate legal issue of whether Lias's use of force was justified; instead he opines generally that Lias's use of force against Jefferson could have been avoided if the EPD had given Lias additional guidance and training. DE 82 at 34–36.

Jefferson also asserts that he retained Bayer to testify about matters requiring specialized knowledge—the intricacies, best practices, and standard operating procedures of police internal affairs units. DE 82 at 38. Jefferson contends that Bayer's testimony will assist the trier of fact in determining whether the City had a custom or unofficial policy of tolerating excessive force by its officers. Jefferson argues that Bayer's opinion on the reasons for requiring regular performance evaluations, reviewing an officer's prior complaint history, and having a detached,

trained cadre of internal affairs officers will illuminate the jury on whether the absence of these and other elements of a modern, professional internal affairs department were evidence of the City's deliberate indifference to a decades-long and continuing pattern of unconstitutional acts by its police officers. DE 82 at 38–39.

For the reasons below, the City's motion to bar Bayer's testimony is denied.

### 1. Applicable Law

The admissibility of expert testimony in federal court is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 has "a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citation omitted). As such, the "rejection of expert testimony is the exception and not the rule." Fed. R. Evid. 702, advisory committee's note to 2000 Amendment. The party offering the expert must establish each requirement by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

Rule 702 has been summarized as embodying "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

As for qualifications, "[t]o qualify as an expert, Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002) (citation omitted). The Third Circuit has instructed courts to interpret this requirement "liberally," and has advised that the basis of specialized

13

knowledge "can be practical experience as well as academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quotations and citation omitted). "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education' [ ] qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) (quoting Fed. R. Evid. 702).

As for reliability, "[a]n expert's opinion is reliable if it is based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Elcock*, 233 F.3d at 745 (cleaned up). In evaluating an expert's reasoning or methodology, a court should consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994) (citations omitted). "[T]his list is non-exclusive and . . . each factor need not be applied in every case." *Elcock*, 233 F.3d at 746.

And as for "fit," expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). This standard is met "when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (citations omitted).

### 2. Analysis

Keeping in mind Rule 702's liberal policy of admissibility, I find that Bayer's proposed testimony meets the requirements of qualifications, reliability, and fit.

First, Bayer is qualified to opine on relevant police policy and procedure, including best practices and standard operating procedures of police department internal affairs units. He has specialized knowledge arising out of his academic training and credentials and, in particular, his practical experience as a law enforcement officer for nearly forty years. *See* DE 82 at 37 (as part of his work in the NYPD, Bayer established a "computerized Early Warning System in the Personnel Bureau to track police behavior," and acted as an Integrity Control Officer within his own precinct"); *see also Toscano v. Case*, No. 11-4121, 2013 WL 5333206, at *9 (D.N.J. Sept. 20, 2013) (plaintiff's expert's "many years in law enforcement, including nearly 40 years as an Officer in the Rutherford, New Jersey Police Department, means he is well-versed in proper police practices and procedures and is indeed qualified to testify as to same"); *id.* at *10 (defense expert's "nearly thirty years of service on the front line of law enforcement means he . . . is well-versed in proper police practices and procedures and is indeed qualified to testify as to same").

Second, Bayer's opinions measure up to the reliability requirements of Rule 702 and the relevant case law. Bayer provides the foundation for his opinions throughout his report. *See* DE 78-5 at 39–42. His opinions are based on, *inter alia*, an analysis of the deposition testimony and documentary evidence produced in this case—including hundreds of pages of CAP investigation reports and EPD internal affairs statistics—as well as his considerable law enforcement experience. Additionally, Bayer's proposed testimony is similar to customs and practices expert testimony that has generally been admitted to clarify or explain police practices and procedures for the jury. *See, e.g.*, *Davis*, 397 F.3d at 178–79 (testimony of police offer serving as an expert

witness as to the methods of operation for drug traffickers in the South Philadelphia area was sufficiently reliable where the officer's testimony was grounded in his 14 years of experience as a veteran of the Philadelphia police force and 12 years of experience with narcotics trafficking cases); *Toscano*, 2013 WL 5333206, at *9–10 (allowing career law enforcement officials to testify about proper law enforcement practices and procedures); *Doswell v. City of Pittsburgh*, No. 07–0761, 2009 WL 1734199, at *12–13 (W.D. Pa. June 16, 2009) (denying summary judgment on claim that the police department failed to train and supervise its employees based in part on police practices expert's opinion that the department's internal investigation practices were deficient);*Williams v. Twp. of W. Deptford*, No. 05–1805, 2008 WL 1809134, at *11 (D.N.J. Apr. 22, 2008) (denying municipality's motion for summary judgment in part due to police practices expert's opinion that police department's procedures for investigating complaints of excessive force were inadequate);

And third, Bayer's testimony satisfies the "fit" requirement of Rule 702. Here, the question is whether Bayer's testimony will help the jury resolve Jefferson's *Monell* claim. Bayer's opinion is based on his knowledge and experience and analysis of depositions and documentary evidence pertaining to the claim. Bayer will not be permitted to express an opinion on the ultimate issues in the case that are the province of the jury: i.e., whether the City had an unofficial policy or custom of indifference to excessive force complaints, and whether any such custom contributed to Jefferson's injuries. But his testimony may be helpful to the finder-of-fact in determining whether the EPD's practices differed from standard law enforcement practices.

The City's criticisms of Bayer's methods and challenges to the factual bases for his opinions go to the weight to be accorded Bayer's opinions, not their admissibility. These arguments provide fair grounds for cross-examination, but not exclusion. When Bayer testifies,

the City will have the opportunity to challenge him on his methodology and opinions, with the aim of undermining his credibility and conclusions. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Walker v. Jacques*, Civil No. 04–351, 2007 WL 2122028, at *6 n.7 (D.N.J. July 23, 2007) (identifying portions of expert's opinion as conclusory but determining that such problems constituted "an issue of credibility more appropriately left to the province of the jury").

In sum, I find Bayer that qualifies as an expert; that his opinions are the product of sufficiently reliable reasoning and factual application for admissibility; and that his opinions are relevant to the *Monell* claim. Accordingly, the City's motion to preclude Bayer's testimony is denied.

### B. City's Motion for Summary Judgment

Counts three and five of Jefferson's third amended complaint, DE 47, assert claims against the City under 42 U.S.C. § 1983 and the NJCRA. In essence, Jefferson alleges that the EPD had an unofficial policy or custom of tolerating and condoning its officers' use of excessive force as evidenced by, among other things, (a) its failure to sustain a single excessive force complaint in the years leading up to the events in question (DE 47 ¶¶ 23–24); (b) its failure to formally evaluate its officers, *id.* ¶ 30; (c) inadequate internal affairs procedures, *id.* ¶ 46; (d) its failure to review officers' complaint histories (including Lias's complaint history) when it received new excessive force complaints, *id.* ¶ 43; and (e) its failure to properly train and supervise its officers. *See id.* ¶ 46 (referencing "inadequate training"); *id.* ("All of the facts set forth in the above paragraphs . . . demonstrate that the City failed to train and supervise its officers adequately . . . .").

The City seeks summary judgment on the *Monell* claim, arguing that (1) Jefferson has not proven a municipal policy or custom that caused a violation of his constitutional rights, DE 78-3 at 9; (2) Jefferson's complaint contains only brief, vague, and conclusory assertions that officers have not been properly trained in, *inter alia*, appropriate use of force, *id.* at 14; and (3) discovery has not revealed evidence that the EPD's training program is inadequate or deficient. *Id.*

For the reasons stated below, the City's motion for summary judgment is denied.

**A.  Summary Judgment Standard**

A court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a), (c). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* The moving party bears the initial burden of demonstrating the absence of material issues of fact. *Celotex Corp.*, 477 U.S. at 323. "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted).

"At the summary judgment stage of proceedings, courts do not weigh the evidence or make credibility determinations, but, instead, leave that task to the fact-finder at a later trial if the court denies summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) (quotations and

citation omitted). The non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citation omitted). Summary judgment should be granted if the Court finds, in consideration of all the evidence, that no reasonable trier of fact could find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

### 1.  42 U.S.C. § 1983 and NJCRA Claims

#### a.  Applicable Law

Section 1983 is not itself a source of substantive rights, but provides a vehicle for vindicating the violation of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). Section 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "To state a claim for relief under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States," and "that the alleged deprivation was committed or caused by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The NJCRA, N.J.S.A. 10:6-1 et seq., was modeled after § 1983 and creates a state law cause of action for violation of an individual's federal and state constitutional rights. *Owens v. Feigin*, 194 N.J. 607, 947 A.2d 653 (2008). "The NJCRA is interpreted analogously to § 1983." *Alexander v. Borough of Pine Hill*, No. 17-6418, 2020 WL 6779148, at *5 (D.N.J. Nov. 18, 2020).

As noted, § 1983 imposes liability on a "person" who violates another's constitutional rights under color of state law, and here Jefferson seeks to impose liability on the City. A

municipality or other local government entity is a "person" for purposes of § 1983, *Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997), and may be liable under § 1983 if it has a policy or custom which led to a violation a plaintiff's constitutional rights. *Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Jefferson does not allege that the City or the EPD had a formally approved official policy that permitted the use of excessive force; rather, his claim is that the de facto custom and practice of the EPD was to tolerate and condone its officers' use of excessive force. That, if proven, is a legally sufficient basis for a *Monell* claim: "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 404.

"[T]he Plaintiffs have the burden of showing that a government policymaker is responsible by action or acquiescence for the policy or custom." *Jiminez*, 503 F.3d at 250. The plaintiff need not specifically identify a responsible decisionmaker, however, because practices that are considered custom or policy under *Monell* are ascribed to municipal decisionmakers. *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

With respect to a claim of excessive force, the Third Circuit has held that a municipality can be found liable under *Monell* when it "knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers." *Beck v. City of Pittsburgh*, 89 F.3d 966, 976 (3d Cir. 1996). "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

### b.  Analysis

On this record, and viewing the disputed material facts in the light most favorable to
Jefferson, a reasonable jury could find that during the relevant time, the City had an unofficial
custom of tolerating its officers' use of excessive force, which caused the constitutional
deprivation alleged here.[5]

The record contains evidence indicating that from 2011 through 2013, i.e., the three years
leading up to the January 15, 2014 incident, there were more than 70 excessive force complaints
brought against EPD officers, and the EPD did not sustain any. DE 82-8 at 13–22. Further, the
City does not appear to dispute Jefferson's assertion that between 2011 and 2018, the EPD
received more than 250 excessive force complaints and did not sustain a single one. DE 78-5 at
39.

As I have previously noted, such numbers, "though suggestive, are insufficient to defeat
summary judgment." *Cooper v. City of Jersey City*, No. 18-9200, 2021 WL 1589348, at *6
(D.N.J. Apr. 22, 2021). But here, as in *Cooper*, there is more. As detailed above, Lias had been
the subject of six CAPS, including three for excessive force, and in two of the excessive force
complaints he was alleged to have drawn his gun, *see* Ginzburg Decl. dated Oct. 17, 2019, Ex. 3
(Lias CAPs History). Further, in each case the investigating officers assumed the credibility of
officers over the complainants, and there is no indication in the investigative reports that the
investigating officers considered Lias's history of complaints. Courts have found genuine issues

---

[5] A finding of liability against the City is contingent on a finding against Lias for excessive force
in violation of the Fourth Amendment. *See Nabelsi v. Holmdel Twp.*, No. 20-20702, 2021 WL
5578851, at *9 (D.N.J. Nov. 30, 2021) (citation omitted) ("The requirement that the plaintiff
must initially prove that he was deprived of a federal right is settled and familiar. That's the first
step in every § 1983 claim, including a claim against a municipality under *Monell*. A *Monell*
plaintiff must establish that he suffered a deprivation of a federal right *before* municipal fault,
deliberate indifference, and causation come into play.") (cleaned up).

of material fact "relating to the adequacy of an investigatory system where, among other facts, the investigative agency did not consider prior or similar complaints against a particular officer and assumed the credibility of officer's testimony while discounting the credibility of witnesses associated with the complainant." *Cooper*, 2021 WL 1589348, at *6 (citing *Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010)).[6]

Second, the EPD did not formally evaluate officers. DE 78-5 at 41; DE 82-3 at 4–7 (Lias testified that the EPD has not evaluated his performance as a police officer since "early in [his] career"; he has never had a semi-annual or annual evaluation; and he has not seen an evaluation with his name on it since he emerged from probationary status"). Bayer, Jefferson's expert, will testify that this is highly unusual for most law enforcement agencies DE 78-5 at 41, and the EPD evidently does not dispute the point. A reasonable jury would not need to, but could, find that a formal evaluation process could have brought to light Lias's excessive force CAPs prior to the January 15, 2014 incident, and triggered a need for discipline or additional supervision and training. *See Forrest v. Parry*, 930 F.3d 93, 102 (3d Cir. 2019) ("The Supercession Executive testified that he was not aware of another major police department that did not have a performance evaluation system."); *id.* at 116 (while evidence that police department lacked clear standards of performance and a "system of progressive discipline that holds both employees and their managers accountable for performance and behavior" does not compel a *Monell* finding, it

---

[6] *See also Sims v. Tropicana Entm't, Inc.*, No. 13-1981, 2016 WL 4801431, at *7 (D.N.J. Sept. 9, 2016) (plaintiff demonstrated a genuine issue of material fact by introducing evidence that the police officer accused of excessive force was subject to six internal affairs complaints in the three years prior to plaintiff's arrest); *D'Arrigo v. Gloucester City*, No. 04-5967, 2007 WL 1755970, at *13 (D.N.J. June 19, 2007) (a jury could find that the city "has a policy or custom of ignoring unconstitutional excessive force in the police department such that it is deliberately indifferent to excessive force in violation of the Fourth Amendment" where plaintiff presented evidence that in 25 years no officer was fired for a disciplinary reason and the police department leadership had "no knowledge or recollection of an internal investigation of a complaint of excessive force that resulted in a finding of excessive force").

"*aids* Plaintiff in establishing genuine issue of material fact suitable for a jury") (emphasis in original).

Third, there is a genuine issue of material fact as to whether the internal affairs unit reviewed, or genuinely reviewed, officers' histories of excessive force complaints. Sacca testified that when a new internal affairs complaint was filed, there was a review of the officer's history in the central filing system maintained by the internal affairs unit. DE 78-5 at 33. However, the internal affairs unit's review of Lias's use of force against Jefferson on January 15, 2014 did not mention his internal affairs history, *see* Ginzburg Decl. dated Oct. 7, 2019, Ex. 1 at 335–37, even though, as discussed above, Lias had recently been the subject of three excessive force complaints (among others). Bayer opines that in a properly administered internal affairs system, "three or four [CAPs] should have triggered an evaluation of Officer Lias's performance and indicated a need for additional training or counseling." DE 78-5 at 41. Additionally, only one of the CAPs that Bayer described in his report referenced a review of an officer's internal affairs history. *Id.* at 250. Further, Sacca testified that he could not answer how many excessive force complaints would need to be lodged before internal affairs issued an early warning. *Id.* at 33.

Fourth, there is a dispute of material fact as to whether excessive force complaints were investigated by trained internal affairs personnel. Sacca testified that all excessive force complaints were handled by internal affairs personnel or, in the case of serious bodily injury, by the Union County Prosecutor's Office. DE 78-5 at 25–26. But there are several examples of excessive force-related CAPs that were investigated by supervisors, not permanent personnel of the internal affairs unit. *See*, *e.g.*, Ginzburg Decl. dated Oct. 7, 2019, Ex. 1 at 001-010 (CAP 5554), 047-49 (CAP 5614), 064 (CAP 5628), 068-70 (CAP 5629), 113-14 (CAP 5757), 145

(CAP 5808), 150 (CAP 5817), 203-05 (CAP 5894/5895/5896), 210 (CAP 5902), 212 (CAP 5914/5915), 332–33 (CAP 5950).

Further, the record indicates that supervisors, and not permanent internal affairs personnel, investigated Lias's pre-January 15, 2014, excessive force complaints. Ginzburg Decl. dated Oct. 7, 2019, Ex. 1 (CAPs 5554, 5757 and 5947). Bayer opines that in his experience the practice of farming out CAPs to patrol supervisors is highly unusual, explaining that internal affairs units are typically staffed by officers detached from the officers they are assigned to investigate. DE 78-5 at 42.

When viewed collectively, the EPD's failure to sustain even one excessive force complaint in the three years leading up to the January 15, 2014 incident, combined with the evidence described above—including Lias's history of six complaints, and three excessive force complaints, in just three years—could lead a reasonable jury to conclude that the EPD had a deficient early warning system; failed to consider officers' excessive force history; tasked supervisors (rather than internal affairs personnel) with excessive force investigations; and failed to meaningfully investigate; all of which contributed to an unofficial custom of tolerating its officers' use of excessive force. *See Beck*, 89 F.3d at 974 (noting that the "jury readily could have found the Office of Professional Standards was nothing more than a facade to cover the violent behavioral patterns of police officers under investigation, to protect them from disciplinary action, and thereby perpetuate the City's custom of acquiescing in the excessive use of force by its police officers").

Or not. A jury could reject any of the factual conclusions above, or could determine that even if the EPD's customs and practices were deficient, they did not cause Jefferson's injuries. That is what an "issue of fact" means. The question ultimately is for the jury to resolve. *Cooper*,

2021 WL 1589348, at *8 ("[T]he purpose of summary judgment is to identify, not to resolve, such factual issues, which are for the jury.").

## IV.      CONCLUSION

A reasonable jury could (but need not) on this record, impose municipal liability on the City pursuant to 42 U.S.C. § 1983 and N.J.S.A. § 10:6-2. Further, Jefferson has met his burden of establishing that his expert's testimony is admissible pursuant to Federal Rule of Evidence 702. Accordingly, the City's motion for summary judgment and to bar Jefferson's expert is denied. An appropriate order follows.


DATED:  September 28, 2022                                  /s/ Kevin McNulty
                                                          _____
                                                          KEVIN MCNULTY
                                                          United States District Judge

25